## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No**. _____**

YONGFENG LI, derivatively on behalf of

PALANTIR TECHNOLOGIES INC.,

      Plaintiff,

v.

ALEXANDER C. KARP, DAVID
GLAZER, SHYAM SANKAR,
STEPHEN COHEN, ALEXANDER
MOORE, SPENCER RASCOFF,
ALEXANDRA SCHIFF, LAUREN
FRIEDMAN STAT, and PETER THIEL,

      Defendants,

-and-

PALANTIR TECHNOLOGIES INC.,

a Delaware Corporation,

      Nominal Defendant.

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

---

Plaintiff Yongfeng Li ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and

on behalf of Palantir Technologies Inc. ("Palantir" or the "Company"), files this Verified

Shareholder Derivative Complaint against Individual Defendants Alexander C. Karp ("Karp"),

David Glazer ("Glazer"), Shyam Sankar ("Sankar"), Stephen Cohen ("Cohen"), Alexander Moore

("Moore"), Spencer Rascoff ("Rascoff"), Alexandra Schiff ("Schiff"), Lauren Friedman Stat

("Stat"), and Peter Thiel ("Thiel") (collectively, the "Individual Defendants," and together with

Palantir, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Palantir, unjust enrichment, and waste of corporate assets; against Defendants Karp, Cohen, and Thiel for abuse of control; against Defendants Karp, Glazer, and Sankar for contribution under Section 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"); and against Defendants Karp, Cohen, Moore, Rascoff, Schiff, Stat and Thiel for violations of Section 14(a) of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Palantir, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Palantir's directors and officers from November 9, 2021 and May 6, 2022 (the "Relevant Period").

2.      Palantir builds software that allows organizations to effectively integrate their data, decisions, and operations. The company was founded in 2003, where it started to build software for the United States intelligence community to assist in counterterrorism operations and

investigations. Palantir has two customer segments, consisting of the government and commercial sectors. Its customers are from the United States and abroad.

3.      Palantir also invests in marketable securities, which consist of equity securities in publicly-traded companies.

4.      Palantir has represented that disruptions and geopolitical instability, such as armed conflicts, economic crises, and public health crises (including the COVID-19 pandemic), are tailwinds for business, as the purpose of Palantir's products and services are to assist its customers in responding to such disruptions.

5.      Palantir announced its first quarter 2022 financial results in a press release issued on May 9, 2022. Palantir disclosed that adjusted earnings per share ("EPS") was only $0.02, while analyst estimates were $0.04 per share. During a conference call on that same date, it was admitted that the EPS figure "include[d] a negative $0.02 impact driven primarily by unrealized losses on marketable securities."

6.      In the press release, Palantir also announced that in the first quarter of 2022, government revenue grew by 16% year-over-year. Compared to prior quarters, this was a significant decline in revenue growth. In addition, the Company predicted only $470 million in sales for the second quarter of 2022, less than analyst estimates of $483.76 million.

7.      After this news came out, the Company's share price fell $2.02, to close at $7.46 per share on May 9, 2022. The share price fell 21.31%.

8.      On the same day, various news outlets reported that the decline in revenue was a surprise to investors since the Company touted that geopolitical instability and other disruptions

were tailwinds for business, and such disruptions—such as the Russia-Ukraine War and the COVID-19 pandemic—were ongoing.

9.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's EPS figures were being negatively affected by Palantir's marketable securities investments; (2) the Company overstated the sustainability of growth and revenues for the government segment; (3) Palantir's revenue growth, especially among its government customers, was significantly declining, even though global conflicts and market disruptions were occurring; (4) due to the foregoing, it was likely Palantir would not meet consensus estimates for its first quarter 2022 EPS and second quarter 2022 sales outlook; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

10.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

12.     Furthermore, during the Relevant Period, six of the Individual Defendants breached their fiduciary duties by engaging in insider sales, netting proceeds of approximately $99.37 million.

13.     In light of the Individual Defendants' misconduct, which has subjected Palantir, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its Chief Operation Officer ("COO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Colorado (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's CEO, CFO, and COO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Palantir's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the

Exchange Act (15. U.S.C. §§ 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

16.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and Palantir is headquartered in this District.

## PARTIES

### Plaintiff

20.     Plaintiff is a current shareholder of Palantir common stock. Plaintiff has continuously held Palantir common stock throughout the Relevant Period.

### Nominal Defendant Palantir

21.     Palantir is a Delaware corporation with its principal executive offices at 1555 Blake Street, Suite 250, Denver, Colorado 80202. Palantir's Class A common stock trades on the NYSE under the ticker symbol "PLTR."

**Defendant Karp**

22.     Defendant Karp is one of the Company's co-founders, serves as the Company's CEO, and has served as a director since 2003. According to the Company's Schedule 14A filed with the SEC on April 28, 2022 (the "2022 Proxy Statement"), as of April 13, 2022, Defendant Karp beneficially owned 6,432,258 shares of the Company's Class A common stock, 60,072,785 shares of Class B common stock (representing 53.1%), and 335,000 shares of Class F common stock (representing 33.3%). Given that the price per share of the Company's Class A common stock at the close of trading on April 13, 2022 was $12.90, Defendant Karp owned approximately $82,976,128 worth of Palantir stock.

23.     For the fiscal year ended December 31, 2021 ("2021 Fiscal Year"), Defendant Karp received $4,483,614 in compensation from the Company. This included $1,101,637 in salary and $3,381,977 in other compensation.

24.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Karp made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 11/16/2021 | 638,629 | $22.91 | $14,632,267 |
| 11/17/2021 | 638,629 | $22.66 | $14,473,249 |
| 11/18/2021 | 638,629 | $22.06 | $14,086,878 |
| 11/22/2021 | 295,683 | $21.10 | $6,238,615 |
| 11/23/2021 | 104,483 | $20.36 | $2,127,691 |
| 11/26/2021 | 195,443 | $20.89 | $4,082,217 |
| 11/29/2021 | 189,695 | $20.96 | $3,976,765 |
| 11/30/2021 | 189,696 | $20.88 | $3,961,042 |

Thus, in total, before the fraud was exposed, he sold 2,890,887 Company shares on inside information, for which he received approximately $63,578,724. His insider sales made with

knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

25.     The Company's 2022 Proxy Statement stated the following about Defendant Karp:

*Alexander Karp.* Mr. Karp is one of our co-founders and has served in various positions with us since co-founding Palantir, most recently as our Chief Executive Officer ("CEO"), and has served as a member of our Board of Directors since 2003. Mr. Karp holds a B.A. from Haverford College, a J.D. from Stanford Law School, and a Ph.D. from Goethe University in Frankfurt, Germany.

Mr. Karp has been selected to serve on our Board of Directors because of the perspective and experience he brings as our CEO and as one of our co-founders.

**Defendant Glazer**

26.     Defendant Glazer serves as Palantir's CFO and Treasurer. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Glazer beneficially owned 1,434,703 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 13, 2022 was $12.90, Defendant Glazer owned approximately $18,507,669 worth of Palantir stock.

27.     For the 2021 Fiscal Year, Defendant Glazer received $475,722 in compensation from the Company. This included $450,000 in salary and $25,522 in other compensation.

28.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Glazer made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 11/22/2021 | 69,293 | $21.10 | $1,462,013 |
| 11/23/2021 | 24,485 | $20.36 | $498,612 |
| 11/24/2021 | 107,412 | $21.04 | $2,260,163 |
| 2/22/2022 | 68,070 | $10.62 | $722,903 |
| 2/23/2022 | 26,477 | $10.90 | $288,625 |

| 2/24/2022 | 106,643 | $11.41 | $1,216,476 |

Thus, in total, before the fraud was exposed, he sold 402,380 Company shares on inside information, for which he received approximately $6,448,792. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

29.     The Company's 2022 Proxy Statement stated the following about Defendant Glazer:

> *David Glazer.* Mr. Glazer has served in various positions with us since 2013, most recently as our CFO and Treasurer. Mr. Glazer holds a B.A. in History from Santa Clara University and a J.D. from Emory University School of Law.

**Defendant Sankar**

30.     Defendant Sankar has served as the Company's COO and Executive Vice President since July 2020. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Sankar beneficially owned 1,855,624 shares of the Company's Class A common stock and 6,114,764 shares of Class B common stock (representing 5.8%). Given that the price per share of the Company's Class A common stock at the close of trading on April 13, 2022 was $12.90, Defendant Sankar owned approximately $23,937,550 worth of Palantir stock.

31.     For the 2021 Fiscal Year, Defendant Sankar received $698,687 in compensation from the Company. This included $509,419 in salary and $189,268 in other compensation.

32.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Sankar made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 11/22/2021 | 197,825 | $21.10 | $4,173,909 |

| 11/23/2021 | 69,894 | $20.36 | $1,423,321 |
| 11/24/2021 | 317,611 | $21.02 | $6,677,771 |
| 2/22/2022 | 194,817 | $10.62 | $2,068,956 |
| 2/23/2022 | 72,055 | $10.90 | $785,183 |

Thus, in total, before the fraud was exposed, he sold 852,202 Company shares on inside information, for which he received approximately $15,129,140. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

33.     The Company's 2022 Proxy Statement stated the following about Defendant Sankar:

> *Shyam Sankar.* Mr. Sankar has served in various positions with us since 2006, most recently as our Chief Operating Officer ("COO") and Executive Vice President. Mr. Sankar holds a B.S. in Electrical and Computer Engineering from Cornell University and a M.S. in Management Science and Engineering from Stanford University.

**Defendant Cohen**

34.     Defendant Cohen is one of the Company's co-founders, serves as the Company's President and Secretary, and has served as a Company director since 2005. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Cohen beneficially owned 592 shares of the Company's Class A common stock, 26,736,322 shares of Class B common stock (representing 23.3%), and 335,000 shares of Class F common stock (representing 33.3%). Given that the price per share of the Company's Class A common stock at the close of trading on April 13, 2022 was $12.90, Defendant Cohen owned approximately $7,637 worth of Palantir stock.

35.     For the 2021 Fiscal Year, Defendant Cohen received $1,928,867 in compensation from the Company. This included $1,229,461 in salary and $699,406 in other compensation.

36.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Cohen made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 11/22/2021 | 256,270 | $21.10 | $5,407,040 |
| 11/23/2021 | 90,556 | $20.36 | $1,844,082 |
| 2/22/2022 | 251,863 | $10.62 | $2,674,785 |
| 2/23/2022 | 93,155 | $10.90 | $1,015,110 |

Thus, in total, before the fraud was exposed, he sold 691,844 Company shares on inside information, for which he received approximately $10,941,017. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

37.     The Company's 2022 Proxy Statement stated the following about Defendant Cohen:

> *Stephen Cohen*. Mr. Cohen is one of our co-founders and has served in various positions with us since co-founding Palantir, most recently as our President and Secretary, and as a member of our Board of Directors since 2005. Mr. Cohen holds a B.S. in Computer Science from Stanford University.
>
> Mr. Cohen has been selected to serve on our Board of Directors because of the perspective and experience he brings as an officer and as one of our co-founders.

**Defendant Moore**

38.     Defendant Moore has served as a Company director since July 2020, joined the Company in February 2005 as one of the founding employees, and served as the director of operations until March 2010. He also serves as a member of the Audit Committee and Compensation, Nominating, and Governance Committee. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Moore beneficially owned 1,828,397 shares of the Company's

Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 13, 2022 was $12.90, Defendant Moore owned approximately $23,586,321 worth of Palantir stock.

39.     For the 2021 Fiscal Year, Defendant Moore received $339,982 in compensation from the Company. This included $65,000 in fees earned or cash paid and $274,982 in RSU awards.

40.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Moore made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 12/1/2021 | 34,000 | $20.19 | $686,528 |
| 1/4/2022 | 33,000 | $18.47 | $609,543 |
| 2/1/2022 | 33,000 | $14.10 | $465,201 |
| 3/1/2022 | 36,500 | $12.02 | $438,620 |
| 4/1/2022 | 36,500 | $13.75 | $501,948 |

Thus, in total, before the fraud was exposed, he sold 173,000 Company shares on inside information, for which he received approximately $2,701,840. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

41.     The Company's 2022 Proxy Statement stated the following about Defendant Moore:

*Alexander Moore*. Mr. Moore has served as a member of our Board of Directors since July 2020. Mr. Moore initially joined us in February 2005 as one of the founding employees and served as our director of operations until March 2010. In February 2013, Mr. Moore co-founded NodePrime, a cloud automation company, where he served as Chief Operating Officer until its acquisition by Ericsson in April

2016. In May 2017, he joined 8VC, a venture capital fund, where he currently serves as partner. Mr. Moore holds a B.A. in Economics from Stanford University.

Mr. Moore has been selected to serve on our Board of Directors due to the perspective and experience he brings as an entrepreneur and venture capitalist and as one of our founding employees.

**Defendant Rascoff**

42.     Defendant Rascoff served as a Company director from July 2020 and chairperson of the Audit Committee until his term expired at the June 2022 annual meeting. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Rascoff beneficially owned 138,506 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 13, 2022 was $12.90, Defendant Rascoff owned approximately $1,786,727 worth of Palantir stock.

43.     For the 2021 Fiscal Year, Defendant Rascoff received $339,982 in compensation from the Company. This included $65,000 in fees earned or cash paid and $274,982 in RSU awards.

44.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Rascoff made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 11/11/2021 | 25,000 | $22.86 | $571,425 |

Thus, in total, before the fraud was exposed, he sold 25,000 Company shares on inside information, for which he received approximately $571,425. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

45.     The Company's 2022 Proxy Statement stated the following about Defendant Rascoff:

*Spencer Rascoff.* Mr. Rascoff has served as a member of our Board of Directors since July 2020. Mr. Rascoff is an entrepreneur and company leader who co-founded Zillow, Pacaso, Hotwire, and dot.LA, and who served as Zillow's Chief Executive Officer for a decade. Prior to Zillow, Mr. Rascoff co-founded and was VP Corporate Development of Hotwire, which was sold to Expedia in 2003.

Mr. Rascoff is now an active angel investor in over 100 companies through his venture firm 75 & Sunny Ventures. He is chairman of dot.LA, a news site covering the Los Angeles tech scene; chairman of Pacaso, a real estate platform for buying second homes; chairman of Path, a social travel startup; chairman of Watch Queue, Inc., a social watch list application; and co-founder and chairman of Recon Technologies Inc., a vertical social media application. Mr. Rascoff is also co-chair and founder of a family of SPACs at Supernova Partners Acquisition Company. Mr. Rascoff is a former board of directors member of Zillow Group, TripAdvisor, Zulily, Julep, and several other tech companies. Before his consumer web career, Mr. Rascoff worked in investment banking at Goldman Sachs and in private equity at TPG Capital. Mr. Rascoff graduated cum laude from Harvard University with a B.A. in Government.

Mr. Rascoff was selected to serve on our Board of Directors based on his extensive experience as a director and executive officer of both publicly and privately held technology companies and his financial expertise.

**Defendant Schiff**

46.     Defendant Schiff has served as a Company director since July 2020 and is a member of the Compensation, Nominating, and Governance Committee. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Schiff beneficially owned 48,453 shares of the Company's Class A common stock and 10,000 shares of Class B common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 13, 2022 was $12.90, Defendant Schiff owned approximately $625,044 worth of Palantir stock.

14

47.     For the 2021 Fiscal Year, Defendant Schiff received $327,482 in compensation from the Company. This included $52,500 in fees earned or cash paid and $274,982 in RSU awards.

48.     The Company's 2022 Proxy Statement stated the following about Defendant Schiff:

*Alexandra Schiff*. Ms. Schiff has served as a member of our Board of Directors since July 2020. Ms. Schiff worked as a reporter for The Wall Street Journal from June 2004 to March 2005 and April 2013 to June 2020. From 2006 to 2009, she served as a staff writer and then contributing editor at Condé Nast Portfolio, a magazine that was formerly part of Condé Nast, a global media company. She has written for publications including The New York Times, Vanity Fair, and Bloomberg Businessweek. She is currently working on her second book for Simon & Schuster. Ms. Schiff holds a B.A. in English from Duke University.

Ms. Schiff has been selected to serve on our Board of Directors due to her business acumen and the unique perspectives she brings as a journalist.

**<u>Defendant Stat</u>**

49.     Defendant Stat has served as a Company director since January 2021 and is a member of the Audit Committee. According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Stat beneficially owned 230,055 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 13, 2022 was $12.90, Defendant Stat owned approximately $2,967,710 worth of Palantir stock.

50.     For the 2021 Fiscal Year, Defendant Stat received $550,004 in compensation from the Company. This included $50,021 in fees earned or cash paid and $499,983 in RSU awards.

51.     The Company's 2022 Proxy Statement stated the following about Defendant Stat:

*Lauren Friedman Stat*. Ms. Stat has served as a member of our Board of Directors since January 2021. Ms. Stat brings a wide range of business and leadership experience, including 15 years of experience at Accenture, from October 2005 to January 2021, where she served as a senior advisor to Fortune 100 companies,

helping her clients develop new strategies, optimize operations, and manage large-scale change. During her tenure at Accenture, she developed deep healthcare expertise and held multiple roles, including leadership of sales pursuits, management of global operations, and responsibility for the growth and profitability of a segment of business.

Ms. Stat has served on the board of directors of The Lorelton, a non-profit retirement and assisted living facility since November 2021 and Tree3, a startup empowering influencers to curate a storefront from millions of products across stores and allow their followers to purchase from a single shopping cart since February 2022. Ms. Stat has served as an Executive in Residence and Health Advisor for Notley, a social impact community and venture organization, since June 2021 and as Fractional Chief Administration Officer and Advisor at Friendly Force, a satellite communications technology company, since December 2021. She holds a B.S. in Science, Technology, and Society with a dual concentration in Math and Chemistry from Stanford University.

Ms. Stat has been selected to serve on our Board of Directors due to her wide range of business and leadership experience, including leadership of sales pursuits, management of global operations, and responsibility for the growth and profitability of a segment of business.

**Defendant Thiel**

52.    Defendant Thiel is one of the Company's co-founders and has served as Chairman of the Board since 2003.  According to the 2022 Proxy Statement, as of April 13, 2022, Defendant Thiel beneficially owned 130,670,931 shares of the Company's Class A common stock (representing 6.7%), 32,459,248 shares of Class B common stock (representing 32.8%), and 335,000 shares of Class F common stock (representing 33.3%). Given that the price per share of the Company's Class A common stock at the close of trading on April 13, 2022 was $12.90, Defendant Thiel owned approximately $1,685,655,009 worth of Palantir stock.

53.    The Company's 2022 Proxy Statement stated the following about Defendant Thiel:

*Peter Thiel*. Mr. Thiel is one of our co-founders and has served as the Chairman of our Board of Directors since 2003. He has served as president of Thiel Capital, an investment firm, since 2011 and as a partner of Founders Fund, a venture capital firm, since 2005. In 1998, Mr. Thiel co-founded PayPal, Inc., an online payment

company, where he served as Chief Executive Officer, President, and Chairman of its Board of Directors from 2000 until its acquisition by eBay in 2002. Mr. Thiel currently serves and has served on the board of directors of Meta Platforms, Inc., a technology company, since 2005 and AbCellera Biologics Inc., a biotechnology company, since 2020. Mr. Thiel holds a B.A. in Philosophy from Stanford University and a J.D. from Stanford Law School.

Mr. Thiel has been selected to serve on our Board of Directors due to his leadership and experience as an entrepreneur and venture capitalist and as one of our co-founders.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

54.     By reason of their positions as officers, directors, and/or fiduciaries of Palantir and because of their ability to control the business and corporate affairs of Palantir, the Individual Defendants owed Palantir and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Palantir in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Palantir and its shareholders so as to benefit all shareholders equally.

55.     Each director and officer of the Company owes to Palantir and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

56.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Palantir, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

57.     To discharge their duties, the officers and directors of Palantir were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

58.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Palantir, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Palantir's Board at all relevant times.

59.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

60.     To discharge their duties, the officers and directors of Palantir were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of Palantir were required to, among other things:

(a)      ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Colorado, and the United States, and pursuant to Palantir's own Code of Conduct;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Palantir conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Palantir and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Palantir's operations would comply with all applicable laws and Palantir's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

61.      Each of the Individual Defendants further owed to Palantir and the shareholders the duty of loyalty requiring that each favor Palantir's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

62.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Palantir and were at all times acting within the course and scope of such agency.

63.      Because of their advisory, executive, managerial, and directorial positions with Palantir, each of the Individual Defendants had access to adverse, non-public information about the Company.

64.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Palantir.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

65.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

66.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, and violations of Section 14(a), 10(b) and 21D of the Exchange Act.

67.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Palantir, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

68.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

69.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Palantir and was at all times acting within the course and scope of such agency.

## PALANTIR'S CODE OF CONDUCT AND AUDIT COMMITTEE CHARTER

### *Code of Conduct*

70.     The Company's Code of Conduct begins by stating that it "*applies to all Palantir officers, directors, employees, contractors, and consultants.*"

71.     The Code of Conduct states that "[i]n all our actions, we hold ourselves . . . to the highest ethical standards." It also provides that "[o]ur culture of trust and excellence requires that all participants in our shared mission be held to the highest standards of conduct— conduct that is at all times legal, ethical, and professional."

72.     In a section titled "**Maintain and Promote Financial Integrity**," the Code of Conduct provides:

> Palantirians are expected to act responsibly and exercise sound judgment with respect to Palantir's finances and financial reporting. Investors rely on accurate and fair financial and business information to understand our financial results. Palantirians must execute financial transactions only with authorization and in compliance with Palantir's policies. Palantirians are also expected to honestly and accurately record and report all financial transactions and business information, comply with Palantir's system of internal controls, and follow applicable laws, regulations, and accounting practices.

> Palantir files reports and other documents with regulatory authorities, including the U.S. Securities and Exchange Commission. In addition, from time to time we make other public communications, such as press releases. Depending upon our position with Palantir, we may each be called upon to provide information to help assure that our public reports and communications are complete, fair, accurate, and

understandable. Every Palantirian must use all reasonable efforts to provide complete, accurate, objective, relevant, timely, and understandable answers to inquiries related to our public disclosures.

Palantirians involved in preparing public reports and communications must use all reasonable efforts to comply with our disclosure controls and procedures. If anyone believes that any disclosure is materially misleading or becomes aware of any material information that they believe should be disclosed to the public, it is that person's responsibility to bring this information to the attention of the legal team. If any Palantirian ever believes that questionable accounting or auditing conduct or practices have occurred or are occurring, they should follow the procedures set forth in the Whistleblower Policy to report this conduct to their lead, Palantir's Chief Legal and Business Affairs Officer or Chief Financial Officer, or through EthicsPoint, Palantir's third-party whistleblower hotline.

73.     The Code of Conduct provides that the Company and its employees, officers, and directors comply with the applicable laws, rules and regulations at all times. It states that the Company is "committed to following the law in the jurisdictions in which [it] operate[s]." It also states that "[a]t Palantir, we take our responsibility to comply with laws and regulations seriously. We must follow applicable laws, rules, and regulations at all times."

74.     The Code of Conduct states, in a section titled "**Never Engage in Insider Trading**" that:

At Palantir, we value transparency throughout the company. We may hear confidential information about Palantir or about other companies during the course of our work or in other conversations. Sharing this information externally, or using this information to buy or sell securities, or to help others buy or sell securities, could be insider trading. Insider trading violates both this Code and the law. Palantir securities may not be traded during company designated blackout periods. All Palantirians must read and follow Palantir's Insider Trading Policy.

*Audit Committee Charter*

75.     The Charter of the Audit Committee of the Board of Directors of Palantir (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

76.     Per the Audit Committee Charter, the Audit Committee's "purpose" is to "assist the Board in fulfilling its responsibilities for overseeing" the following:

- The Company's accounting and financial reporting processes and internal controls, as well as the audit and integrity of the Company's financial statements.

- The qualifications, independence and performance of the Company's registered public accounting firm (the "independent auditor").

- The design, implementation and performance of the Company's internal audit function.

- The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).

- The Company's policies with respect to risk assessment and risk management pertaining to the financial, accounting and tax matters of the Company.

77.     The Audit Committee Charter lists the Audit Committee's responsibilities, a few of which are:

5.     <u>Review Financial Statements.</u> The Committee shall review and discuss the following with management, the internal auditors, if applicable, and the independent auditor, as applicable:

- The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.

- The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the annual financial statements.

- Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

- Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements.

- The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

- Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

*      *      *

8.    <u>Earnings Press Releases and Earnings Guidance.</u> The Committee will discuss generally with the Company's management and the independent auditor, as appropriate, the type of information to be disclosed and type of presentation to be made regarding the Company's earnings press releases, financial information and earnings guidance released to analysts and rating agencies.

9.    <u>Internal Controls.</u> The Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted or changes required in light of any material control deficiencies, the reports and certifications regarding internal control over financial reporting and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

10.    <u>Disclosure Controls and Procedures.</u> The Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures and the reports and certifications over disclosure controls and procedures.

*      *      *

13.    <u>Legal and Regulatory Compliance.</u> The Committee shall:

- Review and discuss with management, the internal auditors, if applicable, and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including Company's Code of Business Conduct and Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs.

- Discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

- Discuss with a senior member of the Company's Legal Department any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

78.     Palantir builds software that allows organizations to effectively integrate their data, decisions, and operations. The company was founded in 2003, where it started to build software for the United States intelligence community to assist in counterterrorism operations and investigations. Palantir has two customer segments, consisting of the government and commercial sectors. Its customers are from the United States and abroad.

79.     Palantir also invests in marketable securities, which consist of equity securities in publicly-traded companies.

80.     Palantir has represented that certain disruptions and geopolitical instability, such as armed conflicts, economic crises, and public health crises (including the COVID-19 pandemic) are tailwinds for business, as the purpose of Palantir's products and services are to assist its customers in responding to such disruptions.

### **False and Misleading Statements**

### *November 9, 2021 Conference Call*

81.     On November 9, 2021, Palantir held its third quarter 2021 earnings conference call. In his prepared remarks, Defendant Sankar noted the Company's growing customer base in the government sector. Defendant Sankar stated, "[w]e have a motivating set of customers and

growing pipeline for big pursuits in '22 and beyond, and it is growing every quarter. We're not

just competing for programs. Our unique capabilities are creating their own opportunities."

82.     During the call, Defendant Sankar also stated the following:

One thing -- perhaps the one thing we have demonstrated to the market is that it is possible to sell software at scale to the government for programs of record where the government might have historically otherwise bought labor and services. And of course in doing so, we have radically transformed the margin profile of these big government contracts. There is an immense opportunity in this sector to partner with existing government contractors to productize their solutions that they are delivering as services today and in doing so, to transform the EBITDA they generate against their existing revenue with our platforms.

83.     When asked a question on "the future of Palantir's Public Sector business, including

if there are any billion-dollar contracts like the latest U.S. Army wins in the pipeline[,]" Defendant

Sankar noted that the Company was "uniquely position[ed] . . .  for future U.S. Army programs"

due to winning several government contracts in the quarter. He also stated:

But that's just the army. We had incredible opportunity that Space force[] and at the Air Force, places that we are investing a lot, we're building on [Indiscernible] Project from [Indiscernible] air force and that forecourt space force reporting to the Space domains awareness platform. A very unique position. We have many independent opportunities to extend the work that we have done under, under USDI and NGA into the Combatant Commands themselves to directly take on near-peer threats . . . . Beyond defense, we see immense opportunities in our pipeline across health from the NHF and VA to the NIH and HHS. We see new opportunities within the Defense Industrial Base in its own right as customers to help them with their own manufacturing, but also in being a strategic partner, helping them capture new revenue streams by AI enabling their hardware platforms. This pipeline has aggregated fee in building. And all of this is happening despite the macro headwinds that we've all heard about across government services.

COVID's impact on delaying the pace of work. And we are just competing for known opportunities. Our capabilities are so unique, we're creating our own opportunities. The macro factors here are big, big tailwinds for us. Clear consensus on the threat from an aggressive CCP, not only in terms of impacts on demand in the U.S. but also in Japan, Korea, Australia, the UK, the west and her allies broadly. The infrastructure bill, and our fit on the programs and awards that are being driven there. Carbon emissions management, EV charging infrastructure, building on our

incredible commercial momentum in the mobility value chain. Delivery of major projects on time and on budget, and more broadly, the opportunity for SIs and primes on infrastructure projects to partner with Palantir, to develop their own high-margin software streams in place of historically low-margin nonrecurring services on our platforms. We are just at the beginning of big secular trends here. Trends that we anticipated and have invested in for years. We are uniquely positioned, cutting-edge product, ready to meet its moment.

***November 9, 2021 10-Q***

84.     Also on November 9, 2021, the Company filed its quarterly report with the SEC for the period ended September 30, 2021 on a Form 10-Q (the "3Q21 10-Q"). The 3Q21 10-Q was signed by Defendants Karp and Glazer and contained Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Defendants Karp and Glazer attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

85.     The 3Q21 10-Q stated that the Company "ha[s] built lasting and significant customer relationships with some of the world's leading government institutions . . . ." The Company also stated that it "anticipate[s] that [its] reach among an increasingly broad set of customers, in both the commercial and government sectors, will accelerate moving forward."

86.     The 3Q21 10-Q also described marketable securities as follows:

Marketable securities consist of equity securities in publicly-traded companies and are recorded at fair market value each reporting period. Realized and unrealized gains and losses are recorded in other income (expense), net on the condensed consolidated statements of operations. During the three and nine months ended September 30, 2021, the Company recorded net unrealized losses of $7.2 million within other income (expense), net on the condensed consolidated statements of operations.

***February 17, 2022 Conference Call***

87.     On February 17, 2022, Palantir held its fourth quarter 2021 and full year 2021 earnings conference call. After being asked by a Jefferies analyst for the Individual Defendants' "perspective on what's happening on the government side[]" since the government "decelerate[d] pretty materially in Q1 in terms of the growth[,]" Defendant Karp responded that "the biggest problem is barrier to entry, which we've clearly solved and then rebarriers to entry, which we've solved or solving, but that's going very well." Defendant Karp stated:

> Well, there's a couple of things that are happening there. So if you were looking at this more like from a scientific perspective, you had a time series that's 15 years, first thing you would do is say, okay, what's happening in that time series over the 15 years. What you see in U.S. gov is a compounded growth of 30%, but like this, which is the positive of U.S. gov is it's reliable. The sums are big. The quality of the revenue is very high.
>
> The -- one of their -- essentially, there are a number of problems, but ***the biggest problem is barrier to entry, which we've clearly solved and then rebarriers to entry, which we've solved or solving, but that's going very well.*** And then the second one is lumpiness. Now you -- that lumpiness still exists. And actually, in some ways, it's worse because to get the integral to grow, you need these massive deals. We also have small deals, but the fact that we are on the biggest, most important parts of the U.S. government on our software is.
>
> So there's really a twofold answer to your question. One, what will happen this year? Are there -- is there deceleration in actual one over a long time series? The answer is clearly no. But then the question is, if the baseline is 30, how does it get to where we want it, which was like the beginning of last year. And now at the end of last year, and the way that happens is the deals we're already positioned to win actually closed.
>
> (Emphasis added).

88.     In addition, Defendant Karp noted that the "danger[s] of the world" will "positively affect [the Company's] revenue," stating:

> [I]f you just look at that chart, I showed you with the [compound annual growth rate (CAGR)] on Foundry, these are the most important programs for a dangerous world.
>
> Now I can't go into all the details, but we used to debate with people, especially my academic friends if the world was dangerous. The danger of the world being

29

clear and present to the U.S. government is very protective. It doesn't guarantee that when this integral actually -- how it behaves, but *it makes it much more likely that it will happen here and positively affect our revenue which is another reason why I suspect that we will do well.*

(Emphasis added).

***February 24, 2022 10-K***

89.     On February 24, 2022, the Company filed its annual report with the SEC for the fiscal year ended December 31, 2021 on a Form 10-K (the "2021 10-K"). The 2021 10-K was signed by each of the Individual Defendants, except for Defendant Sankar, and contained SOX certifications signed by Defendants Karp and Glazer attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

90.     The Company again stated that it "ha[s] built lasting and significant customer relationships with some of the world's leading government institutions" and that it "anticipate[s] that [its] reach among an increasingly broad set of customers, in both the commercial and government sectors, will accelerate moving forward."

91.     Importantly, the Company noted that "[r]ecent crises and systemic shocks, such as the COVID-19 pandemic" have resulted in "customers [] increasingly adopting [Palantir's] software . . . over internal software development efforts."

92.     Finally, the Company attempted to inform investors of market risks of the Company's marketable securities investments, however, fell short of this purpose. The statement contained was a boilerplate provision that failed to inform investors of Palantir's known risks of its marketable securities investments' negative affect on EPS.  The 2021 10-K stated:

As of December 31, 2021, we had outstanding investments valued at $234.2 million in marketable securities. We may continue to make additional investments or sell

the existing investments. These investments are often in early- or growth-stage companies that have minimal public trading history; as such the fair value of these investments may fluctuate depending on the financial outcome and prospects of the investees, as well as global market conditions including recent and ongoing volatility related to the impacts of COVID-19. Additionally, early-stage companies are inherently risky because the technologies or products these companies have under development are typically in the early phases and may never materialize, and they may experience a decline in financial condition, which could result in a loss of a substantial part of our investment in these companies. We record gains or losses as the fair value of these investments change and as we sell them. We anticipate additional volatility to our consolidated statements of operations due to changes in market prices, and as such gains and losses are realized. During the fiscal year ended December 31, 2021, net unrealized losses of \$72.8 million related to marketable securities were recorded in other income (expense), net on the consolidated statements of operations.

93.     The statements in ¶¶ 81-92 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's EPS figures were being negatively affected by Palantir's marketable securities investments; (2) the Company overstated the sustainability of growth and revenues for the government segment; (3) Palantir's revenue growth, especially among its government customers, was significantly declining, even though global conflicts and market disruptions were occurring; (4) due to the foregoing, it was likely Palantir would not meet consensus estimates for its first quarter 2022 EPS and second quarter 2022 sales outlook; and (5) the Company failed to maintain internal controls.

### Proxy Statement

94.     On April 28, 2022, the Company filed its 2022 Proxy Statement. Defendants Karp, Cohen, Moore, Rascoff, Schiff, Stat and Thiel solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

95.     The 2022 Proxy Statement called for the Company shareholders to vote to, *inter alia*: (1) elect Defendants Karp, Cohen, Moore, Schiff, Stat, Thiel, and non-party Eric Woersching ("Woersching"), to the Board and (2) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022.

96.     With respect to the Company's Code of Conduct, the 2022 Proxy Statement stated:

> In addition, our Board of Directors has adopted a code of conduct that applies to all of our officers, directors, employees, contractors, and consultants, including our CEO, CFO, and other executive and senior financial officers. The full text of our corporate governance guidelines and our code of conduct is posted on the investor relations page on our website at https://investors.palantir.com/governance/governance-documents. We intend to disclose any amendments to our code of conduct, or waivers of its requirements, on our website or in filings under the Exchange Act.

97.     Regarding the Role of the Board of Directors' in Risk Oversight, the 2022 Proxy Statement said:

> Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, legal and compliance, and reputational. We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to-day management of risks we face, while our Board of Directors, as a whole and assisted by its committees, has responsibility for the oversight of risk management. Our Board of Directors reviews strategic and operational risk, including cybersecurity risk, in the context of discussions, question and answer sessions, and reports from the management team at each regular Board of Directors meeting, receives reports on all significant committee activities at each regular Board of Directors meeting, and evaluates the risks inherent in significant transactions.

98.     With regards to the Audit Committee's oversight responsibility, the 2022 Proxy Statement stated:

> In addition, our Board of Directors has tasked designated standing committees with oversight of certain categories of risk management. Our Audit Committee assists our Board of Directors in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting and disclosure controls and procedures, legal and regulatory compliance, and also, among other

things, discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management. Our Compensation, Nominating & Governance Committee assesses risks relating to our executive compensation plans and arrangements and assesses risks relating to our corporate governance practices, the performance of our Board of Directors, and the composition of our Board of Directors.

99.     The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein and the insider trading engaged in by six of the Individual Defendants.

100.     Defendants Karp, Cohen, Moore, Rascoff, Schiff, Stat and Thiel further caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's EPS figures were being negatively affected by Palantir's marketable securities investments; (2) the Company overstated the sustainability of growth and revenues for the government segment; (3) Palantir's revenue growth, especially among its government customers, was significantly declining, even though global conflicts and market disruptions were occurring; (4) due to the foregoing, it was likely Palantir would not meet consensus estimates for its first quarter 2022 EPS and second quarter 2022 sales outlook; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

101.     As a result of Defendants Karp, Cohen, Moore, Rascoff, Schiff, Stat and Thiel causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to elect Defendants Karp, Cohen, Moore, Schiff, Stat, Thiel, and non-party Woersching, to the Board.

**The Truth Emerges**

102.    Palantir announced its first quarter 2022 financial results in a press release issued on May 9, 2022. Palantir disclosed that adjusted EPS was only $0.02, while analyst estimates were $0.04 per share. During a conference call on that same date, Defendant Glazer admitted that the EPS figure "include[d] a negative $0.02 impact driven primarily by unrealized losses on marketable securities."

103.    In the press release, Palantir also announced that in the first quarter of 2022, government revenue grew by 16% year-over-year. Compared to prior quarters, this was a significant decline in revenue growth. In addition, the Company predicted only $470 million in sales for the second quarter of 2022, less than analyst estimates of $483.76 million.

104.    After this news came out, the Company's share price fell $2.02, to close at $7.46 per share on May 9, 2022. The share price fell 21.31%.

105.    On the same day, various news outlets reported that the decline in revenue was a surprise to investors since the Company touted that geopolitical instability and other disruptions were tailwinds for business, and such disruptions—such as the Russia-Ukraine War and the COVID-19 pandemic—were ongoing.

106.    For example, *Bloomberg* published an article on May 9, 2022, titled "Palantir Craters Most Since 2020 on Wider-Than-Expected Loss." The article reported that the Company's "shares plummeted as much as 22% . . . the biggest intraday drop since September 2020, after the software maker reported mounting losses and a disappointing sales forecast." The article continued to state that "in the quarter that ended in March, revenue growth from government customers slowed to 16% with sales totaling $241.7 million," which represented "the slowest quarterly

growth for the segment since Palantir began reporting results as a public company in late 2020." This slow growth was "despite new and expanded deals with agencies spurred by continuing fallout from the pandemic and rising geopolitical tensions, particularly the Russia-Ukraine conflict."

107.    On that same day, *the Motley Fool* published an article titled "Why Palantir Stock Crashed Today." The article noted that "[t]he data-mining leader's slowing growth drove many investors to sell their shares."  The article stated that Palantir's "larger government business saw revenue rise by only 16%, to $241 million." Notably, it also stated that this "was a surprise to investors, as the company was widely believed to see significantly higher demand for its government- and defense-focused data services due to the war in Ukraine."

108.    Furthermore, *Investor's Business Daily* published an article on May 9, 2022, titled "Palantir Earnings, Revenue Guidance Miss Amid Slowing Government Growth." The article stated that Palantir's "stock plunged as revenue guidance came in below expectations amid slowing government growth."

## Insider Sales

109.    Defendants Karp, Glazer, Sankar, Cohen, Moore, and Rascoff made insider sales, detailed above, at prices artificially inflated by the false and misleading statements at issue for collective proceeds of $99.37 million.

110.    The sales that occurred shortly after Defendants Karp, Glazer, Sankar, Cohen, Moore, and Rascoff caused the Company to issue false and misleading statements contribute to an inference that they knew of the falsity of the statements and were cashing in while the Company's common stock continued to trade at artificially inflated prices.

111.    For example, following the false and misleading statements issued in the November 9, 2021 conference call and 3Q21 10-Q, Defendant Karp sold 638,629 shares of Company common stock on each of November 16, 17, and 18 for proceeds of $43.19 million, and Defendant Rascoff sold 25,000 shares on November 11, 2021 for proceeds of $571,425.

112.    Following the false and misleading statements issued in the February 17, 2022 conference call, Defendant Glazer sold 68,070 shares of Company common stock on February 22, 2022, 26,477 shares on February 23, 2022, and 106,643 shares on February 24, 2022, for collective proceeds of $2.23 million; Defendant Sankar sold 194,817 shares on February 22, 2022 and 72,055 shares on February 23, 2022, for collective proceeds of $2.85 million; and Defendant Cohen sold 251,863 shares on February 22, 2022 and 93,155 shares on February 23, 2022, for collective proceeds of $3.69 million.

113.    The timing and amount of the insider sales, made while the price of the Company's common stock was artificially inflated, further demonstrates that Defendants Karp, Glazer, Sankar, Cohen, Moore, and Rascoff knew of the falsity of the statements made and that they used this knowledge to enrich themselves while the Company's common stock remained inflated.

## DAMAGES TO PALANTIR

114.    As a direct and proximate result of the Individual Defendants' conduct, Palantir has lost and expended, and will lose and expend, many millions of dollars.

115.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and its CEO, CFO, and COO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

116.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

117.    As a direct and proximate result of the Individual Defendants' conduct, Palantir has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

118.    Plaintiff brings this action derivatively and for the benefit of Palantir to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Palantir, waste of corporate assets, unjust enrichment, abuse of control, and violations of Section 14(a), 10(b) and 21D of the Exchange Act, as well as the aiding and abetting thereof.

119.    Palantir is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Palantir. Plaintiff will adequately and fairly represent the interests of Palantir in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

121.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

122.    A pre-suit demand on the Board of Palantir is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Karp, Cohen, Moore, Schiff, Stat and Thiel (the "Director-Defendants"), and non-defendant Woersching (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

123.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

124.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

125.     Additional reasons that demand on Defendant Karp is futile follow. Defendant Karp is one of the Company's co-founders, serves as the Company's CEO, and has served as a director since 2003. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Karp with his principal occupation, and he receives handsome compensation, including approximately $4.48 million during the 2021 Fiscal Year. As the Company provides Defendant Karp with his primary occupation and means of livelihood, it is unlikely he would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining his compensation and evaluating his continued employment with Palantir. Defendant Karp was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period. In addition, he solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As the Company's highest officer and as a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Karp is a defendant in the Securities Class Action. For these reasons, too, Defendant Karp breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126.     Additional reasons that demand on Defendant Cohen is futile follow. Defendant Cohen is one of the Company's co-founders, serves as the Company's President and Secretary, and has served as a Company director since 2005. Thus, as the Company admits, he is a non-

independent director. Defendant Cohen receives handsome compensation from the Company, including $1.93 million during the 2021 Fiscal Year. In addition, he solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Cohen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127.    Additional reasons that demand on Defendant Moore is futile follow. Defendant Moore has served as a Company director since July 2020, joined the Company in February 2005 as one of the founding employees, and served as the director of operations until March 2010. He is also a member of the Audit Committee and Compensation, Nominating, and Governance Committee. Defendant Moore receives handsome compensation, including $339,982 during the 2021 Fiscal Year. In addition, he solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Moore breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128. Additional reasons that demand on Defendant Rascoff is futile follow. Defendant Rascoff served as a Company director from July 2020 and chairperson of the Audit Committee until his term expired at the June 2022 annual meeting. Defendant Rascoff received handsome compensation, including $339,982 during the 2021 Fiscal Year. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Rascoff breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129. Additional reasons that demand on Defendant Schiff is futile follow. Defendant Schiff has served as a Company director since July 2020. Defendant Schiff is also a member of the Compensation, Nominating, and Governance Committee. She receives handsome compensation, including $327,482 during the 2021 Fiscal Year. In addition, she solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. As a Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too,

Defendant Schiff breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

130.    Additional reasons that demand on Defendant Stat is futile follow. Defendant Stat has served as a Company director since January 2021. Defendant Stat is also a member of the Audit Committee. She receives handsome compensation, including $550,004 during the 2021 Fiscal Year. In addition, she solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting her to the Board. As a Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Stat breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Thiel is futile follow. Defendant Thiel is one of the Company's co-founders and has served as Chairman of the Board since 2003. Thus, as the Company admits, he is a non-independent director. Defendant Thiel solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As the trusted Chairman of the Board and a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Thiel breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.     Additional reasons that demand on the Board is futile follow.

133.     Demand in this case is excused because the Director-Defendants control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. Defendants Karp, Cohen, and Thiel founded the Company. Defendants Karp and Thiel were members of the Board since 2003, Defendant Cohen joined the Board in 2005, and Defendant Moore joined the Company in 2005 as a founding employee. In addition, Defendants Karp and Thiel were students together at Stanford Law School, and Defendants Thiel and Cohen previously worked together at Clarium Capital. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

134.     In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, and violations of the Exchange Act. In addition, the Director-Defendants violated the Code of Conduct by failing to act ethically, engaging in insider trading, failing to ensure the Company's disclosures were accurate,

and failing to ensure the Company complied with applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

135.    Defendants Rascoff (as chairperson), Moore, and Stat (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violations of the Exchange Act. In addition, the Audit Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, and failing to adequately oversee the Company' disclosure controls and procedures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

136.    Palantir has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Palantir any part of the damages Palantir suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

137.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

138.    The acts complained of herein constitute violations of fiduciary duties owed by Palantir's officers and directors, and these acts are incapable of ratification.

139.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Palantir. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Palantir, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

140. If there is no directors' and officers' liability insurance, then the Directors will not cause Palantir to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

141. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### **FIRST CLAIM**

**Against Defendants Karp, Cohen, Moore, Rascoff, Schiff, Stat and Thiel for Violations of Section 14(a) of the Exchange Act**

142. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

143. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

144. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

145.     Defendants Karp, Cohen, Moore, Rascoff, Schiff, Stat and Thiel caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's EPS figures were being negatively affected by Palantir's marketable securities investments; (2) the Company overstated the sustainability of growth and revenues for the government segment; (3) Palantir's revenue growth, especially among its government customers, was significantly declining, even though global conflicts and market disruptions were occurring; (4) due to the foregoing, it was likely Palantir would not meet consensus estimates for its first quarter 2022 EPS and second quarter 2022 sales outlook; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

146.     The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein and the insider trading engaged in by six of the Individual Defendants.

147.     The false and misleading elements of the 2022 Proxy Statement led to the re-election of Defendants Karp, Cohen, Moore, Schiff, Stat, and Thiel, which allowed them to continue breaching their fiduciary duties to Palantir.

148.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

149.     Plaintiff on behalf of Palantir has no adequate remedy at law.

## SECOND CLAIM

**Against Defendants Karp, Glazer, and Sankar for Contribution Under Sections 10(b) and 21D of the Exchange Act**

150.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

151.     Palantir, along with Defendants Karp, Glazer, and Sankar, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Karp, Glazer, and Sankar's willful and/or reckless violations of their obligations as officers and/or director of Palantir.

152.     Defendants Karp, Glazer, and Sankar, because of their positions of control and authority as officers and/or director of Palantir, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Palantir, including the wrongful acts complained of herein and in the Securities Class Action.

153.     Accordingly, Defendants Karp, Glazer, and Sankar are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

154.     As such, Palantir is entitled to receive all appropriate contribution or indemnification from Defendants Karp, Glazer, and Sankar.

### THIRD CLAIM

**Against the Defendants Karp, Cohen, and Thiel for Abuse of Control**

155.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156.     Defendants Karp, Cohen, and Thiel's misconduct alleged herein constituted an abuse of their ability to control and influence Palantir, for which they are legally responsible.

157.     As a direct and proximate result of Defendants Karp, Cohen, and Thiel's abuse of control, Palantir has sustained significant damages. As a result of the misconduct alleged herein, Defendants Karp, Cohen, and Thiel are liable to the Company.

158.     Plaintiff on behalf of Palantir has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

159.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Palantir's business and affairs.

161.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

162.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Palantir.

163.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

164.     In further breach of their fiduciary duties owed to Palantir, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's EPS figures were being negatively affected by Palantir's marketable securities investments; (2)

the Company overstated the sustainability of growth and revenues for the government segment; (3) Palantir's revenue growth, especially among its government customers, was significantly declining, even though global conflicts and market disruptions were occurring; (4) due to the foregoing, it was likely Palantir would not meet consensus estimates for its first quarter 2022 EPS and second quarter 2022 sales outlook; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

165.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

166.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

167.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the

Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

168.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

169.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Palantir has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

170.    Plaintiff on behalf of Palantir has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Palantir.

173.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Palantir that was tied to the performance or artificially inflated valuation of Palantir, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

174.    Plaintiff, as a shareholder and a representative of Palantir, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

175.    Plaintiff on behalf of Palantir has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

176.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

178.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

179.    Plaintiff on behalf of Palantir has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Palantir, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Palantir;

(c)    Determining and awarding to Palantir the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Palantir and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Palantir and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Palantir to nominate at least two candidates for election to the Board; and

    3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding Palantir restitution from the Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 21, 2022

Respectfully submitted,

/s/_Karen Cody-Hopkins_____
**CODY-HOPKINS LAW FIRM**
Karen Cody Hopkins
4610 S. Ulster St # 150
Denver, Colorado 80237
T: (303) 221-4666
F: (303) 221-4374
E: karen@codyhopkinslaw.com

**Counsel for Plaintiff**

**Additional Counsel for Plaintiff:**

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
T: (516) 922-5427
F: (516) 344-6204
E: tbrown@thebrownlawfirm.net